IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| ASHLEY S., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 4:23-cv-26 |

## REPORT AND RECOMMENDATION

Plaintiff Ashley S. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 6.

Presently before the Court is Plaintiff's Brief in Support of Reversal and Remand in a Social Security Case, ECF No. 10, the Commissioner's Brief in Support of the Commissioner's Decision Denying Benefits and in Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 11, and Plaintiff's Reply, ECF No. 12. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern

District of Virginia Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **VACATED** and **REMANDED**.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for DIB on February 22, 2021, alleging disability due to post-traumatic stress disorder ("PTSD"), depression, migraines, numbness in her legs, vitamin deficiencies, anemia, blood pressure complications, blackouts, paranoia, and nightmares. R. at 80, 81.[1] Plaintiff's application was initially denied on May 25, 2021, and again denied upon reconsideration on October 5, 2021. R. at 80, 88. On November 18, 2021, Plaintiff requested a hearing before an administrative law judge. R. at 130–31.

A hearing was held on April 8, 2022, at which Plaintiff appeared with counsel before Administrative Law Judge William Pflugrath ("the ALJ"). R. at 34–79. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 39–79. On July 11, 2022, the ALJ issued a decision finding Plaintiff not disabled. R. at 11–24. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on January 4, 2023, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted her administrative remedies, on February 20, 2023, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. In accordance with the Supplemental Rules for Social Security Actions, on July 18, 2023, Plaintiff filed a brief in support of reversal and remand of the Commissioner's decision. ECF No. 10. On August 18, 2023, the Commissioner filed a brief in support of the Commissioner's decision denying benefits. ECF No. 11. On August 31, 2023, Plaintiff filed a reply brief. ECF No. 12. Because the matter is fully briefed, it is now ripe for recommended disposition.

---

[1] "R." refers to the certified administrative record that was filed under seal on April 19, 2023, ECF No. 5, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

## II. RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was 25 years old at the time of her alleged disability onset date of November 23, 2020. R. at 192. Plaintiff lives with her husband and their five children. R. at 44. She completed high school and earned certificates qualifying her as a phlebotomy technician, certified nursing assistant, and dialysis technician. R. at 46.

### A. Plaintiff's Medical Records Relevant to Alleged Physical and Mental Impairments.

Plaintiff's medical records include both physical and mental impairments. Although Plaintiff's physical complaints include a spine disorder, migraines, hemolytic anemia, obesity, and respiratory system disorder, they are not at issue in this appeal. Accordingly, the Court does not focus on Plaintiff's medical records relating to her physical impairments.

Plaintiff's struggles with mental health began as a teenager when she was hospitalized for attempting suicide. R. at 305. In July of 2020, prior to her alleged disability onset date, Plaintiff sought care from Lisa Kelleher, a psychiatric mental health nurse practitioner ("N.P. Kelleher"). R. at 297–300. At that appointment, N.P. Kelleher noted that Plaintiff had previously been diagnosed with generalized anxiety disorder, major depressive disorder, and PTSD, but had been doing well until she was triggered by seeing a domestic violence news report on television. R. at 297. Upon mental status examination, Plaintiff's affect was depressed and anxious, but she was alert and oriented, well-groomed, and had appropriate eye contact. R. at 299–300.

In February of 2021, Plaintiff returned to N.P. Kelleher, complaining of daily panic attacks, each lasting between ten and sixty minutes. R. at 307. Plaintiff also reported poor sleep, nightmares, flashbacks, and intrusive memories. R. at 307. N.P. Kelleher referred Plaintiff for

therapy. R. at 307–08. N.P. Kelleher also recommended Plaintiff consult an attorney to discuss disability benefits due to her difficulty maintaining employment. R. at 307–08.

During a mental health consultation in April of 2021, Plaintiff was treated by Allison Ovide, a physician's assistant[2] ("P.A. Ovide") for ongoing panic attacks. R. at 2244. Plaintiff reported taking gabapentin and Lexapro to treat her anxiety. R. at 2244. Plaintiff explained that her PTSD and anxiety had been worse recently because she was concerned her abusive ex-husband would be released from incarceration. R. at 2244. During the consultation, P.A. Ovide noted that Plaintiff was alert and oriented, but anxious, and at times, tearful. R. at 2246–47. P.A. Ovide prescribed Plaintiff a short course of Ativan and recommended that she contact her psychiatrist for additional evaluation and refills of medication. R. at 2247.

On July 15, 2021, Plaintiff returned to P.A. Ovide for a follow-up appointment concerning her depression, PTSD, and insomnia. R. at 2144. She requested that P.A. Ovide continue her current course of medication until she could establish care with a new provider. R. at 2144. During the evaluation, P.A. Ovide observed that Plaintiff was alert and oriented, and had a normal appearance and mood. R. at 2147. P.A. Ovide prescribed Lexapro and Desyrel to help treat Plaintiff's mental health symptoms. R. at 2147.

A month later, on August 12, 2021, Plaintiff was treated by Carla Rothmann, a nurse practitioner ("N.P. Rothmann"), for her PTSD. R. at 2083. Plaintiff explained that her current course of medication seemed to treat her symptoms. R. at 2083. She noted that although she still has "some bad days based on triggers," the gabapentin "calm[ed]" her down. R. at 2083. Upon evaluation, N.P. Rothmann noted that Plaintiff's mood, behavior, thought content, and judgment

---

[2] Allison Ovide is variously referred to as a medical doctor by the ALJ, R. at 22, a nurse practitioner or a physician's assistant by the Commissioner, ECF No. 11 at 1 (nurse practitioner) and 4 (physician's assistant), and as a physician's assistant by Plaintiff (ECF No. 10, *passim*). The record demonstrates that Allison Ovide is a physician's assistant. R. at 2144–48.

4

were normal. R. at 2088. N.P. Rothmann continued Plaintiff's medication regimen of gabapentin and Lexapro. R. at 2089.

Only one week later, on August 19, 2021, Plaintiff returned to N.P. Rothmann, reporting an increase in anxiety, with panic attacks occurring over the previous three days. R. at 2076. She also explained that she recently filed a restraining order against an ex-boyfriend which added to her stress. R. at 2076. Plaintiff's symptoms included "hyperventilation," "nausea," and "palpitations." R. at 2076. N.P. Rothmann observed that Plaintiff's mood was "anxious" and her behavior was "agitated." R. at 2081. N.P. Rothmann prescribed Ativan to treat Plaintiff's increased panic attacks and referred her to a psychiatrist. R. at 2081.

The following week, on August 26, Plaintiff returned to N.P. Rothmann for a follow-up appointment. R. at 2068. Upon mental status examination, N.P. Rothmann observed that Plaintiff's mood was "depressed," and she presented with a flat affect and delayed speech. R. at 2073. Plaintiff's attention, perception, and behavior were normal. R. at 2073. N.P. Rothmann prescribed Seroquel to treat Plaintiff's PTSD and depression, Atarax to treat Plaintiff's panic attacks, and continued Plaintiff's use of Ativan. R. at 2073.

One month later, on September 23, 2021, Plaintiff returned to N.P. Rothmann and reported that her PTSD had "improved" and requested to continue her medication regimen. R. at 2059. Upon mental status examination, N.P. Rothmann observed that Plaintiff's mood, behavior, and appearance were normal and noted that Plaintiff was fully oriented. R. at 2065. N.P. Rothmann continued Plaintiff's mental health medication regimen as requested. R. at 2065.

On January 6, 2022, Plaintiff returned to P.A. Ovide, complaining of increased anxiety due to her husband's pending release from incarceration. R. at 2471. Plaintiff noted that her current medication regimen was working well, but that it "feels like she needs something more." R. at

2471. Upon mental status examination, Plaintiff's mood and behavior were normal. R. at 2472. To treat Plaintiff's worsened anxiety, P.A. Ovide prescribed an increased dose of Seroquel. R. at 2472.

### B. P.A. Ovide's Medical Opinion.

In April of 2022, P.A. Ovide completed a check-the-box medical evaluation report opining on Plaintiff's functional capacities. R. at 770–71. Therein, P.A. Ovide listed Plaintiff's impairments as: "anxiety, depression, PTSD, migraines." R. at 770. In evaluating Plaintiff's mental abilities, P.A. Ovide noted that Plaintiff had no limitations related her understanding and memory, including her abilities to: remember locations and work-like procedures; to understand and remember short and simple instructions; and to understand and remember detailed instructions. R. at 770.

As for Plaintiff's abilities related to sustained concentration and persistence, P.A. Ovide found that Plaintiff had no limitations in her abilities to carry out short and simple instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to sustain an ordinary routine without special supervision; to work in coordination with others without being distracted; and to make simple work-related decisions. However, P.A. Ovide opined that Plaintiff had extreme limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. at 771.

In evaluating Plaintiff's social interaction limitations, P.A. Ovide determined Plaintiff had no limitations in her abilities to ask simple questions, and to maintain socially appropriate behavior, but marked limitations in her abilities to interact appropriately with the general public

6

and to get along with co-workers without distracting them or exhibiting behavioral extremes, and extreme limitations in her ability to accept instructions or respond appropriately to criticism from supervisors. R. at 771.

Finally, with respect to Plaintiff's adaptation limitations, P.A. Ovide opined that Plaintiff had no limitations in her ability to be aware of normal hazards, moderate limitations in her ability to set realistic goals or make plans independently of others, marked limitations in her ability to travel to unfamiliar places or use public transportation, and extreme limitations in her ability to respond appropriately to customary stresses in a work setting. R. at 771. In the narrative section, P.A. Ovide added that Plaintiff had a history of domestic abuse and "paranoia of ex-husband still living in [the same] community." R. at 771.

### C. Consultative Examiner Dr. Karen Armstrong's Medical Opinion.

On September 1, 2021, Dr. Karen Armstrong ("Dr. Armstrong") conducted a consultative psychological exam of Plaintiff via telehealth appointment. R. at 762–65. Dr. Armstrong and Plaintiff discussed her medical and personal history, as well as Plaintiff's prior work experience. R. at 762–63. Plaintiff reported severely impaired sleep, nightmares, and anxiety triggered by her past abusive relationship. R. at 762–63. She also reported that her anxiety made her feel physically ill. R. at 762. Plaintiff explained that she often had to leave her previous job because she was "vomiting, shaking, crying, and could not function." R. at 762.

Upon mental status examination, Dr. Armstrong noted that Plaintiff was alert and fully oriented, presenting with a casual appearance and good hygiene. R. at 764. Plaintiff was able to understand Dr. Armstrong's questions, and her thought progress, memory, and eye contact were within normal limits, although she did appear "mildly anxious." R. at 764. Plaintiff's thought content was positive for repetitive thoughts regarding her ex-husband and her family's safety, and

7

she reported "being hypervigilant to the environment always." R. at 764. Dr. Armstrong also observed that Plaintiff had "poorer functioning" on tasks that required attention. R. at 764. Upon cognitive testing, Plaintiff was able to spell "world" forward and backward, but had "mild difficulty" calculating serial sevens, which required her to put forth "excessive effort." R. at 764. Dr. Armstrong diagnosed Plaintiff with PTSD, major depressive disorder, and generalized anxiety disorder. R. at 764.

In her evaluation, Dr. Armstrong assessed Plaintiff's functional capabilities. R. at 765. Dr. Armstrong made the following findings:

> [Plaintiff] seemed to have the ability to reason at an average level. Her memory seemed grossly intact. She reported periods of what might be dissociation, reinforcing the potential benefit to her of trauma focused psychotherapy to learn coping skills to stay grounded in the present. She seemed able to understand and remember a simple vocational instruction of one to two steps. She seemed to have intact social interaction skills for dealing with supervisors and coworkers, but exposure to the public does seem to make her very anxious. She could accept benign supervision. She does not seem well-suited to public-facing vocations at this time due to anxiety. The safety issue of having perceived potential attackers in her geographic area is one that she will need to address with if she is to function adaptively in vocational or other settings while living in her current location. However, she is going out in public for her children's sporting events, suggesting that she may be able to do so for vocational purposes if she can find an appropriate work setting, She is likely to need accommodations to deal with noise (e.g., allowing her to use noise cancelling headphones), with the physical layout of a workspace to help her feel safe, and a plan to cope with seeing the specific brand of energy drinks that remind her of ex-husband. There may be other triggers that will have to be addressed in a workplace as well. Her tolerance for stress seemed well below average, but she does also seem to have personal strengths as pointed out by her prior practitioner who worked with her for a long time.

R. at 765.

### D. Relevant Mental Evaluations Completed by State Agency Examiners

On May 21, 2021, state agency psychologist Howard Leizer, Ph.D. ("Dr. Leizer"), issued his findings after reviewing Plaintiff's medical records. R. at 85–86. Dr. Leizer opined that Plaintiff had no significant limitations in her understanding and memory, and ability to adapt, but

8

some limitations in her sustained concentration and persistence, and social interaction. Specifically, with respect to her sustained concentration and persistence, Dr. Leizer found Plaintiff moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. at 86. Dr. Leizer determined Plaintiff would require "minimal accommodations" to assist her with concentration and persistence, and recommended that Plaintiff work in a "well-spaced" work environment with "only a few familiar coworkers" to help her avoid distractions. R. at 86. With respect to her social interactions, Dr. Leizer found Plaintiff moderately limited in her abilities to interact appropriately with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. at 86. To account for these limitations, Dr. Leizer explained that Plaintiff's interaction with the public should be "brief and infrequent," and although she could interact with coworkers to complete her duties, she would be "best suited for work that does not require frequent social interaction" due to her psychiatric symptoms. R. at 86. Upon reconsideration, state agency psychologist Dr. Richard Milan, Jr. agreed with Dr. Leizer's conclusions. R. at 95–96.

### E. Plaintiff's Testimony at ALJ Hearing

At the ALJ hearing, Plaintiff testified that she finished high school and earned a CNA certificate, a dialysis certificate, and a phlebotomy technician certificate. R. at 46. She lives with her five children and her husband, who acts as her caretaker. R. at 44–45.

Plaintiff testified that many of her mental health symptoms are due to the abuse she suffered at the hands of her ex-husband, which left her with nightmares and paranoia. R. at 55, 57. Plaintiff reported that her triggers include loud noises, her ex-husband's native language, a brand of energy

drink that her ex-husband frequently drank, and individuals that resemble her ex-husband. R. at 56–59. She explained that if triggered, she would "completely shut down," "start throwing up," and shake. R. at 54. Plaintiff testified that being around more than ten people at a time could make her "really anxious" and that she was not doing "well [a]round people anymore." R. at 53.

Plaintiff explained that she had difficulty functioning in the workplace due to her symptoms. R. at 54. She would often call in sick to work or leave early due to her nightmares or anxiety attacks. R. at 55. Although the dialysis center she worked at was locked, Plaintiff reported feeling unsafe. R. at 58. Her boss attempted to make accommodations for Plaintiff, including granting special permission for Plaintiff to conceal carry her weapon, but she still felt unsafe and remained unable to complete an entire workday. R. at 58. Plaintiff testified that she eventually lost her job because she was unable to function at work. R. at 56.

### III. **THE ALJ'S DECISION**

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation). At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments. § 404.1545(a). At step

four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ considers whether the claimant can perform other work. § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of November 23, 2020. R. at 14. At step two, the ALJ found that Plaintiff has the following severe impairments: migraines, hemolytic anemia, respiratory system disorder, anxiety, depression, obesity, and PTSD. R. at 14. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 14–16.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, with the following limitations:

> The claimant can frequently but not always climb stairs, stoop, kneel, crouch, and crawl. She can only occasionally climb stairs, climb ladders, balance, stoop, kneel,

11

crouch and crawl. The claimant can never climb stairs, climb ladders, stoop, kneel, crouch and crawl.³ She can have no exposure to sustained loud noises, bright lights, and workplace hazards such as unprotected heights or dangerous machinery. The claimant can have no more than occasional exposure to vibration, or to fumes, gases or pulmonary irritants. She can frequently but not always twist the lumbar spine, i.e., the lower back. The claimant is limited to performing only simple, repetitive, and routine tasks. She is limited to only nonproduction-paced tasks as to tempo and capacity (i.e., non-assembly line work). The claimant is limited to maintaining a persistent effort on only routine tasks. She is limited to only rare interaction with the public; but may be in the presence of the public. She is limited to only occasional interaction with co-workers and supervisors.

R. at 17 (internal footnote omitted).

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." R. at 17.

At step four, the ALJ determined that Plaintiff was incapable of performing her past relevant work as a dialysis technician. R. at 22. While Plaintiff cannot resume her prior employment, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy. R. at 23. Thus, the ALJ determined that Plaintiff was not disabled from the alleged onset date, November 23, 2020, through the date of his decision, July 11, 2023. R. at 24.

## IV. <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "'evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craig v.*

---

³ These clear misstatements were not addressed by the parties and are not dispositive of the Court's decision. However, the ALJ would be well advised to address these issues in a subsequent consideration.

12

*Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's appeal to this Court raises two challenges to the ALJ's decision. First, Plaintiff argues that the ALJ erred by failing to properly evaluate the opinion of the consultative examiner, Dr. Armstrong. ECF No. 10 at 7–10. Second, Plaintiff argues that the ALJ erred by failing to properly evaluate the opinion of Plaintiff's treating provider, P.A. Ovide. *Id.* at 10–13. Plaintiff alleges these errors render Plaintiff's RFC unsupported by substantial evidence. *Id.* at 7–12.

Under the SSA regulations[4], the ALJ must consider each medical opinion in the record and articulate how persuasive they find the medical opinion based on the following factors: (1)

---

[4] Because this matter involves a claim filed after March 27, 2017, the revised regulations regarding the evaluation of medical opinions set forth in Section 404.1520c apply in this case. Under the new regulations,

13

supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. § 404.1520c(b), (c)(1)–(5). Supportability and consistency are "the most important factors" in determining the persuasiveness of a medical opinion, and accordingly, the ALJ must explain how he or she considered those factors in the written decision. § 404.1520c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are," the "more persuasive the medical opinion[]" will be. § 404.1520c(c)(1). As for consistency, "[t]he more consistent a medical opinion[]" is with "evidence from other medical sources and nonmedical sources," the "more persuasive the medical opinion[]" will be. § 404.1520c(c)(2). The ALJ may explain how they considered the other factors, including the medical source's relationship with the claimant, but are only required to do so when contradictory medical opinions regarding the same issue are equally supported by and consistent with the record. § 404.1520c(b)(2). If medical opinions regarding the same issue are equally supported by and consistent with the record, the ALJ must articulate the other factors and consider their impact on the persuasiveness of the medical opinions. § 404.1520c(b)(3).

Generally, the ALJ "'need not repeat herself regurgitating [the evidence of record] each time that she considers an opinion,' so long as the ALJ points to specific parts of the record that prove consistent or inconsistent with the relevant opinion such that the Court can determine whether substantial evidence supports the weight assigned." *Vanessa M. v. Saul*, No. 3:19cv12, 2019 WL 6749416, at *13 (E.D. Va. Dec. 11, 2019) (quoting *Ross v. Berryhill*, 2019 WL 289101, at *6 (E.D. Va. Jan. 3, 2019) (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019)).

---

ALJs no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion." 20 C.F.R. § 404.1520c(a).

14

However, the ALJ is still required to at least articulate whether or not the opinion is consistent with the other evidence in the record. *See* § 404.1520c(b)(2) ("we will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision). "The Court may not 'fill in the blanks for the ALJ[,]' nor may the Court '[h]armoniz[e] conflicting evidence,' or 'bolster[] inconclusive findings' as these activities fall outside the scope of review." *Tanzi F. v. Saul*, No. 3:19cv167, 2021 WL 3205050, at *8 (E.D. Va. July 8, 2021) (citing *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662–63 (4th Cir. 2017), *report and recommendation adopted*, No. 3:19cv167, 2021 WL 3192162 (E.D. Va. July 28, 2021).

### A. The ALJ Erred in Evaluating the Opinion of Consultative Examiner Dr. Armstrong.

Plaintiff argues that the ALJ erred in two ways when evaluating Dr. Armstrong's opinion. First, Plaintiff argues that the ALJ erred when finding Dr. Armstrong's opinion internally inconsistent. ECF No. 10 at 8. Second, Plaintiff contends the ALJ erred when focusing on Dr. Armstrong's use of equivocal language such as the word "seemed." ECF No. 10 at 8. In response, the Commissioner argues that the ALJ's decision must be read as a whole, and that the ALJ evaluated both the supportability and consistency of Dr. Armstrong's opinion, and as such, applied the correct legal standard. ECF No. 11 at 14. In reply, Plaintiff re-states the argument that the ALJ erred in analyzing Dr. Armstrong's opinion by incorrectly finding it internally inconsistent. ECF No. 12 at 1–2.

> The ALJ found Dr. Armstrong's opinion partially persuasive, stating:
>
> Dr. Armstrong opined the claimant seemed to [be] able to reason at an average level, and to have intact social interaction skills but exposure to the public makes her anxious but would likely need accommodations to deal with noise and other triggers would need to be addressed in the workplace as well. Her tolerance for stress seemed well below average. I find this opinion to be partially persuasive as the claimant's allegations of PTSD and difficulty being in the public is supported

>by the examination and the record and as such I find her limited to rare interaction with the public. However, not all limitations appear to be supported, and the statements provided are equivocal indicating that the claimant "seemed" able to perform them. Additionally, as Dr. Armstrong points out the claimant goes into the public for her children's sporting events and as such could likely go into the public for vocational activities. Therefore, while this opinion is considered and is partially persuasive, the totality of the record does not support all limitations including reduction of triggers such as a specific brand of energy drink and the indication that her tolerance for stress is well below average.

R. at 21–22.

The Court finds that the ALJ failed to sufficiently evaluate Dr. Armstrong's opinion. In addressing supportability, as Plaintiff argues, the ALJ stated that while Plaintiff's allegations of PTSD and difficulty being in the public are supported by the record, "not all limitations appear to be supported." *See* ECF No. 10 at 8–10. The ALJ does not further explain exactly which limitations "appear [not] to be supported," but seems to rely on Dr. Armstrong's use of purportedly equivocal language to find some limitations not supported. Yet in crafting the RFC, the ALJ borrowed heavily from Dr. Armstrong's opinion, even explicitly adopting limitations containing the purported equivocal phrasing. For example, Dr. Armstrong noted that although Plaintiff would not "seem" to be well-suited to employment directly involving the public, her ability to watch her children's sporting events in public indicated that she would be able to work in public with "an appropriate work setting." R. at 765. The ALJ agreed with Dr. Armstrong, despite her use of the word "seem," and incorporated her recommendation into the RFC. *See* R. at 17. Similarly, the ALJ incorporated Dr. Armstrong's opinion that Plaintiff "seemed able to understand and remember a simple vocational instruction of one to two steps," by limiting Plaintiff to "simple, repetitive, and routine tasks" in the RFC. R. at 764; R. at 17. Thus, it is not clear from the ALJ's analysis which of Dr. Armstrong's limitations were not supported by her opinion, or why the ALJ found such limitations not supported.

With respect to consistency, as Plaintiff points out, the ALJ failed to articulate whether Dr. Armstrong's opinion was consistent with other medical and nonmedical sources. *See* ECF No. 10 at 9–10. Notably, the ALJ stated only that the "totality of the record" does not support all of Dr. Armstrong's recommended limitations, "including reduction of triggers such as a specific brand of energy drink and the indication that her tolerance for stress is well below average." R. at 22. Even affording the ALJ the benefit of the doubt that this statement addresses the consistency of Dr. Armstrong's opinion with the overall record, the ALJ's citation to the "totality of the record" does not allow the Court to meaningfully review the ALJ's consistency analysis. Moreover, the ALJ's general citation to the totality of the record is especially unhelpful considering evidence in the record about Plaintiff's triggers.[5] The ALJ also failed to identify any part of the record that was inconsistent with Dr. Armstrong's opinion that Plaintiff's tolerance for stress seemed "well below average." *See* R. at 765.

The ALJ's failure to sufficiently explain the supportability and consistency factors in his explanation of Dr. Armstrong's opinion is error. *See* § 404.1520c(b)(2). The Court cannot "bolster[] inconclusive findings" when the ALJ offers confusing explanations about the supportability of the opinion and does not discuss the extent to which Dr. Armstrong's opinion was either consistent or inconsistent with the evidence in the record beyond noting the "totality of the record" did not support Dr. Armstrong's findings. *See Patterson*, 846 F.3d at 662; R. at 22. Accordingly, remand is warranted for the ALJ to consider the supportability of Dr. Armstrong's

---

[5] Plaintiff testified to her triggers, including the name of the specific energy drink, multiple times during the ALJ hearing. R. at 56, 61, 64. The ALJ himself questioned Plaintiff about the energy drink, asking if "[b]y any chance [she] had a diagnosis that would suggest it's almost like a phobia of your ex-husband including by proxy? So when you say you almost pass out when you smell a monster drink that's not normal." R. at 64.

17

opinion, as well as its consistency with the other evidence in the record, and to assess whether that opinion affects Plaintiff's RFC or ultimate disability determination.

### B. The ALJ Did Not Err in Evaluating Treating Provider P.A. Ovide's Opinion.

Plaintiff argues that the ALJ erred in finding P.A. Ovide's opinion unpersuasive for three reasons. First, Plaintiff alleges the ALJ incorrectly determined that P.A. Ovide's opinion was internally inconsistent. ECF No. 10 at 10. Second, Plaintiff contends that the ALJ placed unjustifiable importance on Plaintiff's normal mental status examinations. ECF No. 10 at 10. Finally, Plaintiff argues that the ALJ erred by incorrectly assessing P.A. Ovide's treatment plan of medication and intermittent therapy. ECF No. 10 at 10. In response, the Commissioner argues that the ALJ evaluated both the supportability and consistency of P.A. Ovide's opinion, and as such, applied the correct legal standard. ECF No. 11 at 17. In reply, Plaintiff argues that the ALJ erred by incorrectly finding inconsistencies in P.A. Ovide's opinion. ECF No. 12 at 3–4.

The ALJ found P.A. Ovide's opinion unpersuasive, stating that:

> [I]t is internally inconsistent and is not supported by the record.[] It is unlikely that someone with the opined extreme limitation in completing a normal workday would not have some limitation in memory or concentration. The [Plaintiff's] mental status examinations have been largely normal and outside of medication management and periodic therapy, the [Plaintiff] has not required significant care and there is no indication it has been requested. The [Plaintiff] presented to the emergency room on a number of occasions during the period at issue and generally denied any mental symptoms. As such, while she has limitations they do not support the opinions assessed here and are inconsistent with the totality of the record.

R. at 22.

With respect to supportability, the ALJ sufficiently explained that P.A. Ovide's opinion was not supported by her own opinion because it was internally inconsistent.  As the ALJ noted, although P.A. Ovide found extreme limitations in Plaintiff's ability to complete a normal workday without interruptions from psychologically based symptoms, she found no limitations at all in

18

Plaintiff's ability to carry out other tasks related to her concentration, persistence, and pace. *See* R. at 22; R. at 770–71. P.A. Ovide found that Plaintiff had no limitations in her ability to carry out short and simple instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to sustain an ordinary routine without special supervision; to work in coordination to others without being distracted; and to make simple work-related decisions, but then found that Plaintiff could not complete a normal workday or workweek without interruptions from psychologically based symptoms. R. at 770–71. Thus, the ALJ addressed the supportability factor by explaining that this extreme limitation was not supported by and was internally inconsistent with P.A. Ovide's own opinion.

With respect to consistency, the ALJ sufficiently explained that P.A. Ovide's opinion conflicted with both medical and nonmedical information in the record. R. at 22. In explaining the consistency factor, the ALJ noted Plaintiff's repeated normal mental status exams, as well as to the stability in her treatment, as she received only minor adjustments to her medication management. R. at 22. The ALJ also noted that Plaintiff did not require significant care, or mental health hospitalizations. R. at 22; *see also* R. at 2247; R. at 2147; R. at 2471–72. Accordingly, the ALJ sufficiently addressed the consistency factor by comparing P.A. Ovide's opinion to other treatment notes in Plaintiff's medical record.

Because the ALJ did not err in evaluating P.A. Ovide's opinion, remand is not warranted on this ground.

## VI. RECOMMENDATION

Because the ALJ erred by failing to properly articulate the supportability and consistency factors when evaluating Dr. Armstrong's opinion, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **VACATED** and **REMANDED**.

## VII. **REVIEW PROCEDURE**

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

/s/ Lawrence R. Leonard
Lawrence R. Leonard
United States Magistrate Judge

Newport News, Virginia
November 8, 2023